AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

<table>
<tr><td>

United States of America

v.

Gage Pascoe

_____
*Defendant(s)*

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Case No.3:20-mj-71726 MAG

</td></tr>
</table>

FILED

Nov 24 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 16, 2020_____ in the county of _____Contra Costa_____ in the _____Northern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) and (b)(1)(C) | Distribution of Fentanyl Resulting in Death or Great Bodily Injury |
|  | Maximum Life Imprisonment; Mandatory Minimum 20 years Imprisonment; Maximum Fine of $1 million; Maximum term of Supervised Release of life; Mandatory $100 Special Assessment |

This criminal complaint is based on these facts:

Please see attached affidavit of DEA Task Force Officer Paul Miovas

❏ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Paul Miovas, DEA Task Force Officer
*Printed name and title*

Approved as to form _____/s/_____
AUSA __Ross Weingarten_____

Attested to by the applicant in accordance withthe
requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____11/24/2020_____

City and state: _____San Francisco, California_____

_____
*Judge's signature*

Hon. Thomas S. Hixson, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR CRIMINAL COMPLAINT AND ARREST WARRANT

I, Paul Miovas, a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA") currently assigned to the San Francisco Divisional Office, Oakland Resident Office in California being duly sworn, state:

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for a criminal complaint and arrest warrant authorizing the arrest of Gage PASCOE ("PASCOE") for a violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), distribution of a controlled substance, to wit suspected fentanyl, resulting in death or serious bodily injury, on or about June 16, 2020, in the Northern District of California ("Target Offense").

### SOURCES OF INFORMATION

2.      This affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrant.  I have not included every fact known to me concerning this investigation.  Instead, I have set forth only the facts necessary to establish probable cause that violations of the federal law identified above have occurred.

3.      I have based my statements in this affidavit on my training and experience; personal knowledge of the facts and circumstances from my participation in this investigation; information provided by other agents and law enforcement officers, including Officers from the Walnut Creek Police Department ("WCPD"); and information I have reviewed from relevant law enforcement records and databases.  Where I refer to conversations and events, I often refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted.  This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds.

**AFFIANT BACKGROUND**

4.        I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

5.        I am a sworn Peace Officer for the State of California, and have been so employed since June 2008.  I received formal training at the Contra Costa County Sheriff's Office P.O.S.T. Accredited Police Academy in Pittsburg, California.  I am employed by the Concord Police Department ("CPD"), and I am a deputized Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA").  As a TFO, I am currently assigned to the DEA's San Francisco Division, Oakland Resident Office, Task Force Group.

6.        Since being sworn as a DEA TFO, I have received training and/or instruction in: basic narcotic investigations, drug identification and detection, drug interdiction, familiarization with U.S. narcotics laws, financial investigations and money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance, informant development, Title III investigations, and undercover operations.

7.        During the course of my law enforcement career, I have been involved in investigations of numerous federal and state criminal offenses.  I have participated in investigations of illicit drug trafficking organizations, ranging from street level dealers to major dealers.  These investigations have included the use of confidential sources (CSs), undercover agents, and sources of information (collectively "Sources"); toll records; physical surveillance; search warrants; and state and federally authorized periods of wiretap interception.  These investigations have targeted offenses including the unlawful importation, possession with intent to distribute, and distribution of controlled substances, in addition to the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses.  These investigations have resulted in numerous state and/or federal prosecutions of individuals who

2

have possessed, imported, or distributed controlled substances, as well as the seizure of those illegal drugs and the proceeds from the sale of those illegal drugs.

8.      In conducting physical surveillance, I have personally observed narcotics transactions, counter-surveillance techniques, and the methods that narcotics traffickers use to conduct clandestine meetings.

9.      As part of executing narcotics-related search warrants, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances.  I am familiar with the appearance of heroin, cocaine, methamphetamine, marijuana, MDMA, and other controlled substances.  I am familiar with and aware of the terminology used by narcotics traffickers concerning narcotics and narcotics dealing.

10.     I have interviewed numerous narcotics dealers, users, and confidential informants, and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, the use and meaning of coded language and the concealment of assets.  I have become familiar with the manner in which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds.  I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

11.     Before becoming a TFO, I was also a K9 handler for approximately four years.  I attended narcotic detection training with my assigned K9, which was 160 hours of specialized training in the detection of marijuana, cocaine, heroin, and methamphetamine.  My assigned K9 was subsequently certified in narcotic detection.  I maintained our narcotic certification and conducted weekly narcotics training with my assigned K9 throughout our career together.

12.     Through my years of experience and my training, I have developed expertise in the daily operations of subjects involved in these types of criminal activities through personal

observations, arrests, and interviews with suspects that have committed crimes related to drug possession, sales, and trafficking, as well as associates of suspects who commit these crimes.  I have also developed expertise in the packaging and preparation of narcotics, drug quantities/sale amounts, and methods of operation of drug users and traffickers.   I have examined documentation of various methods in which illicit drugs are smuggled, transported, and distributed. Throughout these investigations, I have also gained expertise in the use of a variety of law enforcement techniques, including the use of confidential sources and undercover agents, surveillance techniques, and various other types of electronic techniques.

## APPLICABLE STATUTES

13.    Title 21, United States Code, §§ 841(a)(1) and (b)(1)(C) – Distribution of a controlled substance, to wit suspected fentanyl, resulting in death or serious bodily injury.

## FACTS SUPPORTING PROBABLE CAUSE

14.    On June 17, 2020, Walnut Creek Police Department ("WCPD") responded to a call about a reported deceased subject ("Victim") at a home in Walnut Creek, California.  WCPD officers arrived and found the Victim lying in bed, cold to the touch, and the Victim was pronounced dead at the scene.  Upon inspection, WCPD officers did not observe signs of a break-in, trauma, suicide note, or any obvious signs of foul play.

15.    The Contra Costa County Coroner's Office took custody of the Victim's body to perform an autopsy.  The next day, the Coroner's Office informed law enforcement that opiates and benzodiazepine were present in the Victim's urine.  Later, the Victim's toxicology report confirmed the Victim had 160 ng/mL of fentanyl in her system at the time of death.

16.    Law enforcement obtained and executed a state search warrant to view the contents of the Victim's cellular telephone.  On the Victim's phone, law enforcement identified text messages between the Victim and an individual identified as Gage PASCOE.  I know based on this investigation that Victim and PASCOE attended the same high school in Walnut Creek, California, and knew each other from high school.  Those messages, described in more detail below, indicate that on the day that the Victim died, PASCOE and the Victim met up at

4

PASCOE's home, where PASCOE sold the Victim purported "Oxy," a common term used for

Oxycodone.  However, I believe based on this investigation that PASCOE actually sold the

Victim counterfeit Oxycodone pills that were laced with fentanyl.

      17.    The text messages between PASCOE and the Victim begin on June 3, 2020, and

show that PASCOE was selling narcotics to, and buying prescription narcotics from, the Victim.

The following is an unofficial transcription of relevant portions of the text message thread

between PASCOE and the Victim, beginning on June 3, 2020 and leading up to the Victim's

death on June 16, 2020:

> **PASCOE** to Victim, June 3, 2020 at 5:12 pm: "Need more oxy?"

> **PASCOE** to Victim, June 4, 2020 at 7:23 am: "Nd u got anymore addies"
> Victim to **PASCOE**, June 4, 2020 at 10:03 am: "Yeah more oxy and I can try and get
> another script of addies lemme calm my dr"
> **PASCOE** to Victim, June 4, 2020 at 7:28 pm: "Ay so I can get more oxys I'm meeting
> up w my olug tonugh"
> **PASCOE** to Victim, June 4, 2020 at 7:28 pm: "Lmk"
> **PASCOE** to Victim, June 4, 2020 at 7:28 pm: "How many"
> **PASCOE** to Victim, June 4, 2020 at 7:28 pm: "She got only so many but lmk cause she
> gets only 60 a month"
> Victim to **PASCOE**, June 4, 2020 at 7:55 pm:  "Probably like 10"

> Victim to **PASCOE**, June 10, 2020 at 10:01 am: "Yo dude did you get those Oxy's I'm
> running low and wanna cop more"
> Victim to **PASCOE**, June 10, 2020 at 10:01 am: "Hit me up when you get this"

> Victim to **PASCOE**, June 11, 2020 at 9:02 am: "Gage"
> Victim to **PASCOE**, June 11, 2020 at 9:02 am: "Hit me up"
> Victim to **PASCOE**, June 11, 2020 at 9:02 am: "I wanna cop more of those Oxy's"

> Victim to **PASCOE**, June 13, 2020 at 8:20 am: "Can you get those today?"
> **PASCOE** to Victim, June 13, 2020 at 8:20 am: "Yea my bad lemme hit my boytofay"
> Victim to **PASCOE**, June 13, 2020 at 8:21 am: "Forsure hit me up when you make
> contact. I wanna cop like 10"

> Victim to **PASCOE**, June 15, 2020 at 9:50 am: "Hit me up man"
> **PASCOE** to Victim, June 15, 2020 at 11:16 am: "Hey my b my olug didn't have em but I
> just got off ohone w my other connect u still want those I can make that happen I'm not
> working today"

5

Victim to **PASCOE**, June 15, 2020 at 11:17 am**:** "Yeah make it happen I want them today"
Victim to **PASCOE**, June 15, 2020 at 11:17 am**:** "Stay in contact today I need those. I'm completely out"
Victim to **PASCOE**, June 15, 2020 at 2:08 pm**:** "Gage"
**PASCOE** to Victim, June 15, 2020 at 5:22 pm**:** "I can get 13 u need em"
**PASCOE** to Victim, June 15, 2020 at 6:19 pm**:** "Lmk"
Victim to **PASCOE**, June 15, 2020 at 6:19 pm**:** "Yeah get em"
**PASCOE** to Victim, June 15, 2020 at 6:19 pm**:** "Ok"
**PASCOE** to Victim, June 15, 2020 at 8:02 pm**:** "When can u pick em up"
Victim to **PASCOE**, June 15, 2020 at 8:02 pm**:** "Where are you?"
Victim to **PASCOE**, June 15, 2020 at 8:03 pm**:** "Are you mobile?"
**PASCOE** to Victim, June 15, 2020 at 8:16 pm**:** "No I work tmmrw mom near heather farms tho"
**PASCOE** to Victim, June 15, 2020 at 8:16 pm**:** "Lmk tho I'll go grab em"
Victim to **PASCOE**, June 15, 2020 at 8:16 pm**:** "Grab em. Can we meet tomorrow? I'll come to you. Will you respond tomorrow when I text you?"
**PASCOE** to Victim, June 15, 2020 at 8:17 pm**:** "Okay it'll be 390 I'm going to go pick em up then"
Victim to **PASCOE**, June 15, 2020 at 8:18 pm**:** "Okay bring em to work with you. I'll come to you in the morning so please have your phone on ya"

18.     I believe, based on my training and experience, that this conversation shows that PASCOE sold narcotics to the Victim, and purchased controlled substances like Adderall from the Victim.  PASCOE initially asked the Victim if she needed "more Oxy," which is a common street term for Oxycodone.  I know that Oxycodone is an opioid that can be obtained through a legitimate prescription from a doctor, but is also often sold illegally and can be very dangerous to the user if used improperly.  I also know that counterfeit Oxycodone pills are common in the Northern District of California, and are often laced with fentanyl.

19.     PASCOE then asked the Victim if she had anymore "addies," which is a common street term for Adderall.  The Victim replied to PASCOE that she wanted more "oxy" and that she would try to get another "script" for Adderall.  I know that "script" is a common street term for a prescription.  Based on these messages, I believe that the Victim was purchasing purported Oxycodone pills from PASCOE and providing PASCOE with Adderall pills that she obtained from a legitimate prescription.

20.      When the Victim texted PASCOE "I wanna cop like 10," I believe based on my training and experience that the Victim was asking to purchase ten pills from PASCOE.  When PASCOE texted "olug," I believe he meant to type "plug," which is a common street term for a source of supply of narcotics.  I believe PASCOE was telling the Victim he planned to meet with his source of supply of drugs.  PASCOE then texted the victim that his source of supply did not have pills for sale, but that a different source of supply did and he could get the Victim 13 pills.  Finally, PASCOE texted the victim "it'll be 390," which I believe is the price of the requested 13 pills.  I know based on my training and experience that $30 per pill is a common asking price for legitimate Oxycodone, which is usually a dollar per milligram.

21.      On June 16, 2020, the day the victim died, the Victim and PASCOE exchanged the following text messages:

> Victim to **PASCOE,** June 16, 2020 at 8:26 am**:** "Hey"
> **PASCOE** to Victim, June 16, 2020 at 8:42 am**:** "Hey whatsup I passed out last night but my homie still has those for me he's gonna be sliding to me soon then we can meet."
> Victim to **PASCOE**, June 16, 2020 at 9:29 am**:** "How soon?"
> Victim to **PASCOE**, June 16, 2020 at 9:53 am**:** "Yo"
> Victim to **PASCOE**, June 16, 2020 at 11:46 am**:** "Hit me up man"
> **PASCOE** to Victim, June 16, 2020 at 12:17 pm**:** "I'm waiting on my boy give me a min my b"
> Victim to **PASCOE**, June 16, 2020 at 12:17 pm**:** "Okay but can we please meet up today. I need them today. For real. Like keep in contact with me please"
> Victim to **PASCOE**, June 16, 2020 at 12:17 pm**:** "How long will it take for your guy"
> Victim to **PASCOE**, June 16, 2020 at 12:22 pm**:** "??"
> Victim to **PASCOE**, June 16, 2020 at 12:57 pm**:** "Gage"
> **PASCOE** to Victim, June 16, 2020 at 1:03 pm**:** "Chill I'm waiting on him to reply it shouldn't be longer than a hour"
> Victim to **PASCOE**, June 16, 2020 at 1:03 pm**:** "Okay make sure you hit me ASAP. Thanks
> Victim to **PASCOE**, June 16, 2020 at 2:28 pm**:** "?"
> Victim to **PASCOE**, June 16, 2020 at 4:16 pm**:** "Gage"
> Victim to **PASCOE**, June 16, 2020 at 5:45 pm**:** "Gage"
> **PASCOE** to Victim, June 16, 2020 at 7:50 pm**:** "I'm picking up them now sorry for the lag."
> Victim to **PASCOE**, June 16, 2020 at 7:50 pm**:** "Okay when can we meet up?
> Victim to **PASCOE**, June 16, 2020 at 8:22 pm**:** "??"
> **PASCOE** to Victim, June 16, 2020 at 8:23 pm**:** "I'm getting em rn u can meet me at my house in outt"

Victim to **PASCOE**, June 16, 2020 at 8:23 pm**:** "I can meet you there yeah. Send me the addy"
Victim to **PASCOE**, June 16, 2020 at 8:24 pm**:** "I'm gonna leave rn"
Victim to **PASCOE**, June 16, 2020 at 8:45 pm**:** "Yo I'm at your place"
Victim to **PASCOE**, June 16, 2020 at 9:10 pm**:** "You Coming outside?"
**PASCOE** to Victim, June 16, 2020 at 9:10 pm**:** "Just seen this"
**PASCOE** to Victim, June 16, 2020 at 9:10 pm**:** "Phone died"
**PASCOE** to Victim, June 16, 2020 at 9:10 pm**:** "Coming out"
Victim to **PASCOE**, June 16, 2020 at 9:11 pm**:** "Fasho"

22.     Based on my training and experience, I believe that this conversation shows that PASCOE and the Victim met up at approximately 9:10 p.m. on June 16, 2020, the night the Victim overdosed on narcotics and died, so that PASCOE could sell narcotics to the Victim.  I believe this because the Victim asked PASCOE if they could "please meet up today" because "I need them today."  PASCOE responded "I'm picking them up now sorry for the lag."  I believe that when he referred to "them," PASCOE was referring to counterfeit pills.  PASCOE then instructed the Victim that the Victim could "meet me at my house."

23.     The Victim's subsequent messages then show that the Victim did in fact travel to PASCOE's house.  At 8:24 p.m., the Victim texted PASCOE "I'm gonna leave rn," which I believe is short for "right now."  Evidence from the Victim's phone shows that at approximately 8:26 p.m. on June 16, 2020, the Victim entered PASCOE's address (2203 Lynbrook Dr., Pittsburg, CA) into Apple Maps, suggesting that the Victim began driving to his house.  At 8:45 p.m., the Victim texted PASCOE "Yo I'm at your place."  At 9:10 p.m., the Victim followed up "You coming outside?"  PASCOE responded, "Coming out."  Based on these messages, I believe that PASCOE at the Victim met up at approximately 9:10 p.m. to conduct a sale of narcotics.

24.     Law enforcement conducted a review of historical cell site information for both the Victim's phone and PASCOE's phone.  The historical cell site information confirmed that PASCOE's cell phone and the Victim's cell phone were very close together on the evening of June 16, 2020, at the time when the text messages described above suggest that PASCOE and the Victim were together conducting a narcotics deal.  Specifically, historical cell site information

shows that at approximately 9:10 p.m. on June 16, 2020, both PASCOE's cell phone and Victim's cell phone were in the vicinity of PASCOE's home address in Pittsburg CA.

25.     On July 13, 2020, law enforcement contacted the Victim's father and learned he found pills in the Victim's room as he was cleaning it out.  Law enforcement collected these pills, which had "M30" stamped on them.  I know, based on my training and experience, that pills stamped with "M30" are often counterfeit Oxycodone pills that are often times laced with fentanyl.  Moreover, I know that counterfeit "M30" pills laced with fentanyl are responsible for numerous overdose deaths in the Northern District of California and throughout the country.

26.     I later took possession of the pills and submitted them to the DEA Western Laboratory for analysis.  The lab tested the pills and the results confirmed that they contained fentanyl.

27.     I also learned as part of this investigation that the Victim made an ATM withdrawal of $240 on the day the Victim met up with PASCOE, which I believe was to pay for the drugs the Victim planned to purchase from him.

28.     As part of this investigation, an undercover law enforcement officer ("UC") contacted PASCOE and attempted to purchase narcotics from him.  The UC exchanged several text messages with PASCOE regarding a potential sale of narcotics.  In one text message, PASCOE asked the UC if he wanted "blues."  I know based on my training and experience that "blues" is a common street term for Oxycodone 30 mg pills, which are often blue in color. These are the same pills that were located in the Victim's room after her death, and the same pills that are often counterfeit and laced with fentanyl.  During a different text message conversation, the UC mentioned the usually purchases his pills from the Hondurans in the "TL," which I know is a reference to the Tenderloin District in San Francisco.  On October 2, 2020, PASCOE replied, "I have to go out there after work to grab some shit also."  Based on this text message, I believe that PASCOE travels to the Tenderloin District in San Francisco to purchase narcotics, which he then resells to customers.  Ultimately, PASCOE did not sell narcotics to the UC.

29.     As part of this investigation, I have reviewed an opinion letter written by Dr. Patil Armenian, an Assistant Professor of Clinical Emergency Medicine at UCSF in Fresno, California.  Dr. Armenian was retained as an expert by the government in this matter.  Dr. Armenian opined in her letter that the Victim died of a "fatal fentanyl overdose" and that "absent the fentanyl, [Victim] would not have died."  Dr. Armenian continued that the amount of fentanyl in Victim's body at the time of death, 160 ng/mL, was "very high" and that, because of the "low level of its metabolite norfentanyl (2 ng/mL)," Victim "likely died very soon after the fentanyl was introduced" into Victim's body.  I know based on my training and experience that when an individual ingests a narcotic such as fentanyl, the body metabolizes those narcotics and produces a metabolite of that narcotic.  The fact that the amount of the fentanyl metabolite – norfentanyl - was very low in the Victim's body at the time of death suggests that the Victim's body did not have time to metabolize the fentanyl before it killed the Victim.

30.     Dr. Armenian also opined that the presence of a "very low level of acetyl fentanyl (0.10 ng/mL)… most likely represents contamination during illicit production" of fentanyl, as opposed to fentanyl produced in a "legitimate pharmaceutical plant."  Finally, Dr. Armenian found that although other compounds, such as Diazepam, were found in the Victim's body, "these were not ultimately responsible for [Victim's] death on June 17, 2020" because the amount of those compounds found in Victim's body are "consistent with chronic use and does not represent an overdose pattern."

31.     I believe, based on the fact that the Victim texted with PASCOE about purchasing drugs from him on the night the Victim overdosed and died, and then actually met up with PASCOE at his house, that the drugs that PASCOE sold the Victim caused her to overdose and die.  I also believe that when the Victim requested "Oxy," PASCOE sold the Victim counterfeit Oxycodone "M 30" pills that were laced with fentanyl, as evidenced by the toxic level of fentanyl in the Victim's body when the Victim died.

//

//

10

## **CONCLUSION**

32.     On the basis of my training and experience, my participation in this investigation, and the information summarized above, there is probable cause to believe that on or about June 16, 2020, in the Northern District of California, PASCOE committed a violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) – Distribution of a controlled substance, to wit suspected fentanyl, resulting in death or great bodily injury.

                                              /s/
_____
PAUL MIOVAS
Task Force Officer
Drug Enforcement Administration


Sworn to before me over the telephone and signed
by me pursuant to Fed.R.Crim.P 4.1 and 4(d) on
this 24th  day of November 2020

_____
HONORABLE ~~LAUREL BEELER~~  Thomas S. Hixson
UNITED STATES MAGISTRATE JUDGE