DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ROSS WEINGARTEN (NYBN 5236401)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6747
    Fax: (415) 436-7234
    Ross.Weingarten@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 3-20-71726 MAG |
| Plaintiff, | MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION TO DETAIN |
| v. | Date: December 14, 2020 |
| GAGE PASCOE, | Time: 10:30 a.m. |
| Defendant. | Hon. Laurel Beeler |

This case is about a vulnerable young woman, stressed and anxious about family circumstances and the COVID-19 pandemic, who reached out to the defendant, her former high school classmate, seeking to purchase pills from him that would help ease her pain. On June 16, 2020, she drove to the defendant's home and purchased what she believed were Oxycodone pills from the defendant. She returned home, took some of those pills, said goodnight to her girlfriend, and never woke up.

The defendant in this case, Gage Pascoe, is a 22-year old resident of Pittsburg, California, who deals deadly fentanyl and other drugs. He sold deadly counterfeit pharmaceutical pills laced with fentanyl that caused his former classmate, a 23 year-old woman, to overdose and die. The government's evidence in this case shows that he obtains at least some of the narcotics he sells from the Tenderloin neighborhood of San Francisco, and then brings them back to his friends and customers in the East Bay

1

for sale.  For the reasons set forth below, the defendant poses a danger to the community and a risk of flight that cannot be mitigated by conditions of release, and as such, the government seeks his detention.[1]

## I. BACKGROUND

### A. The Charged Offense

On November 24, 2020, the government filed a sealed criminal complaint charging the defendant with one count of distribution of fentanyl resulting in death or serious bodily injury, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  Dkt. No. 1.  The affidavit of Drug Enforcement Administration (DEA) Task Force Officer ("TFO") Paul Miovas submitted in support of the complaint details much of the government's evidence against the defendant.  *Id.*

Specifically, on June 17, 2020, police in Walnut Creek, California responded to a call about a deceased subject.  When they arrived, they found O.K. ("Victim"), a 23 year-old woman, lying in bed, cold to the touch.  She was pronounced dead at the scene.  On the Victim's phone, law enforcement found text messages between the Victim and the defendant showing that in the days leading up to the Victim's death, the defendant and the Victim arranged for a sale of narcotics.  Specifically, the defendant reached out to the Victim on June 3, 2020, asking her "Need more oxy?"  The Victim responded that she did, and the defendant told her he was meeting up with his drug source to get some.  A few days later, the Victim texted the defendant again, telling him that she needed "those Oxy's" and that she was "running low" and wanted to "cop more."  The defendant told the Victim on June 15, 2020 that his normal drug source did not have any pills for sale, but that his "other connect" did and he could "make that happen."

On June 16, 2020, the day she died, the Victim again asked the defendant for pills, texting him "can we please meet up today.  I need them today.  For real.  Like keep in contact with me please."  Eventually, the defendant asked the Victim to meet him at his house.  Evidence shows that the Victim drove from her home in Walnut Creek to the defendant's home in Pittsburg, where they met up around

---

[1] The government submits this memorandum without the benefit of the bail study to be completed by the Pretrial Services Office.  The government will address any additional issues raised in the bail study during the detention hearing set for Monday, December 14, 2020 at 10:30 a.m.

9:10 p.m. Cell site location data shows the defendant's phone and the Victim's phone very close together at the time their text messages suggest they met to conduct the narcotics deal. After obtaining pills from the defendant, the Victim drove home and took the pills she purchased. The Victim then spoke via Facetime with her girlfriend before bed. The next morning, the Victim's girlfriend called to check on the Victim but got no answer, so she went to her house to check on her. She found her girlfriend lying in bed, dead from a drug overdose.

A few weeks after the Victim's death, her father was cleaning out her bedroom when he found blue pills stamped with "M-30" on them. He called law enforcement, who seized those pills. Law enforcement tested the pills found in Victim's bedroom and they showed the presence of fentanyl. Counterfeit "M-30" pills like the ones the defendant sold to the Victim are responsible for numerous overdose deaths in our community. They are manufactured to look like Oxycodone 30mg pills, which is why the defendant asked the Victim if she needed "more Oxy." Tragically, they are not Oxycodone—a dangerous opioid in its own right—but rather counterfeit pills laced with fentanyl that, too often, prove deadly.

As part of this investigation, the government has retained an expert to review the toxicology and autopsy reports of the Victim. The expert found that the Victim died of a "fatal fentanyl overdose." According to the expert, the toxicology evidence also supports a finding that the fentanyl that killed the Victim was counterfeit and was not made in a "legitimate pharmaceutical plant." In sum, the evidence in this case shows that the defendant sold the Victim counterfeit pharmaceutical pills laced with fentanyl, which caused her to overdose and die.

**B.    The Defendant Sold Drugs to Others, Including Another Classmate Who Overdosed**

As part of this investigation, the government has learned that the defendant sold drugs to others both before and after the Victim's death. Earlier this year, the defendant sold drugs to an individual, E.C., who also died of a drug overdose on February 24, 2020. E.C., like the Victim in this case, was a high school classmate of the defendant's. He was living with his mother after spending months in drug treatment trying to end his addition. Social media messages between the defendant and E.C. show that in the days before his death, E.C. and the defendant discussed narcotics trafficking. For example, the defendant asked E.C. "how much you getting your rolls for?" The government believes that "rolls" is

3

slang for 100 counterfeit pills.  The two also discussed getting a "g of black," which is code for heroin, and a "g of coke," which is code for cocaine.  E.C. and the defendant exchanged messages on social media about narcotics the day before E.C. died.  While the government has not charged the defendant in connection with the death of E.C., his overdose death—which occurred a few months before the death of the Victim in this case—shows that the defendant knew how dangerous illegal narcotics can be, yet he chose to continue to sell them anyway in order to make a profit.

Even after the Victim's death, the defendant continued to pursue the sale of dangerous drugs.  As part of this investigation, an undercover law enforcement agent reached out to the defendant to attempt to purchase narcotics.  The defendant told the undercover officer that he gets at least some of his drugs for sale from "the City."  The context of the conversation made clear that the defendant was referring to the Tenderloin neighborhood of San Francisco.  This suggests that the defendant would come to the Tenderloin, purchase narcotics, and then return to his home community to sell them to customers at a profit.  In the messages, which took place in September and October 2020, the defendant was enthusiastic about the prospect of selling drugs to the undercover officer, although no deal was ever completed.

Law enforcement also obtained a search warrant for the defendant's iCloud account, which is his Apple cloud-based storage system.  In the defendant's iCloud, law enforcement agents found pictures and videos of pills and messages about drug transactions, showing clearly that he was a narcotics trafficker.  In fact, it appears as though the defendant named his own phone number as "Plug," which is slang for a source of drugs, showing that the defendant embraced his role dealing dangerous narcotics in his community.

Finally, when the defendant was arrested in connection with this charge on December 5, 2020, he possessed a gram of fentanyl in his pocket.  Two black, electronic scales were found inside the driver's door and were set to measure grams, suggesting that the defendant used them to weigh narcotics for sale. A 9mm Glock handgun with a loaded 10 round magazine was also found in a bag in the back seat of the vehicle. At this point, the government does not know whether the firearm belonged to the defendant, or to another individual who was in the defendant's car with him when he was arrested.  Regardless, the presence of a loaded firearm in the defendant's vehicle underscores the tremendous danger that is

always present when illegal narcotics are bought and sold.

## II.   APPLICABLE LEGAL STANDARD

Pursuant to the Bail Reform Act, codified at 18 U.S.C. § 3142, if the Court finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, the Court shall order the detention of the person before trial. 18 U.S.C. § 3142(e)(1). In making such a determination, the Court shall take into account the available information concerning:

>   (1) the nature and circumstances of the offense charged, including whether the offense involves a firearm;
>
>   (2) the weight of the evidence against the person;
>
>   (3) the history and characteristics of the person, including—
>
>   (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>   (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or, local law; and
>
>   (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

"The facts that the Court uses to support a finding that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." 18 U.S.C. § 3142(f)(2)(B). The burden of proof rests with the government prior to trial. See United States v. Hir, 517 F.3d 1081, 1096 (9th Cir. 2008). Upon a motion for detention before trial, the government bears the burden of demonstrating by a preponderance of the evidence that no set of release conditions will mitigate the risk of non-appearance. See United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985). The rules concerning admissibility of evidence in criminal trials do not apply to a detention hearing. 18 U.S.C. § 3142(f)(2)(B).

//

## III. ARGUMENT

### A. The Defendant Poses a Danger to the Community that Cannot be Mitigated by Any Combination of Conditions.

If the defendant is released, there is a tremendous risk that he will continue to sell the same narcotics that have already caused the Victim to overdose and die. The fact that the defendant has continued to sell drugs despite the overdose deaths of his friends shows that he will stop at nothing in his pursuit of profits from narcotics sales. No conditions of release will prevent him from returning to distributing narcotics. Given the potency of fentanyl, as demonstrated by the overdoses of the victims in this case, "the nature and seriousness of the danger to any person or the community" cannot be overstated. In the government's view, it would pose an unacceptable risk to the community if the defendant were to distribute even one additional dosage of fentanyl, as the risk of another overdose would be great.

Along with posing a great danger to the community due to his repeated distribution of fentanyl, the defendant also poses a significant risk of flight. He is facing a mandatory minimum 20 years in prison if he is convicted. While the government does not have a clear picture of the defendant's and his family's finances, the government believes based on the evidence gathered in this case that the defendant has the resources to flee. Given the serious federal charges he faces, poses a significant risk of flight if he were released from custody.

In the government's view, no combination of conditions can sufficiently mitigate the risk of danger to the community posed by the defendant's release. For instance, releasing the defendant to an unsecured facility such as a halfway house would not prevent him from absconding and engaging in continued drug distribution or fleeing the District. Nor would a surety or custodian adequately prevent the defendant from selling drugs. The defendant's conduct in this case shows that he sets up drug deals using text messages or social media, and there is no realistic way that a surety or custodian could prevent him from contacting others using a phone, tablet, or computer. The deals that the defendant sets up have the potential to cause death, as evidenced by the Victim's overdose.

In light of the foregoing, the government respectfully submits that it has met its burden of

showing by clear and convincing evidence that the defendant poses a danger to any person or to the community and poses a risk of flight that cannot be sufficiently mitigated by conditions of release.

**IV.   CONCLUSION**

For the reasons stated above, the government respectfully requests that this Court order that defendant Gage Pascoe be detained prior to trial.

DATED:  December 11, 2020                                  Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

   */s/ Ross Weingarten*
ROSS WEINGARTEN
Assistant United States Attorney

7